UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

LAUREN CALDERON

Plaintiff,

-v-

The CITY OF NEW YORK, New York City
Department of Correction ("DOC") Commissioner
Joseph Ponte, Supervising Warden VICTOR
VASQUEZ, Warden TONY DURANTE, DOC
Officers F/N/U GRIFFITHS, F/N/U DANIELS, and
NYC DOC OFFICERS JOHN/JANE DOES Nos. 1-
10 in their individual capacities,

Defendants.
-------------------------------------------------------------------x

**FIRST AMENDED
COMPLAINT AND
JURY DEMAND**

17 CV 3643 (NRB)

Plaintiff LAUREN CALDERON, through her attorneys, Rebecca M. Heinegg, Esq., and

Sarah Kunstler, Esq., as and for her complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. Plaintiff, LAUREN CALDERON, a transgender woman, was the victim of several assaults,

   rape, and discrimination while detained at Rikers Island.

2. Pursuant to the Civil Rights Act of 1871, amended and codified as 42 U.S.C. § 1983, and the

   laws of the State of New York, plaintiff LAUREN CALDERON brings this civil rights

   action for violations of her constitutional and common law rights for injuries caused by New

   York City Department of Correction Officers, and by the municipal policies, practices and

   customs of their employer, Defendant City of New York.

1

3. Due to defendants' deliberate and intentional conduct, Ms. Calderon was exposed to and became the victim of continued harassment and several incidents of sexual assault when she was housed in an all-male dormitory. Further, due to the negligent and intentional use of force by Department of Correction Officers GRIFFITHS, DANIELS and others, Ms. Calderon was assaulted and battered, suffering serious physical injuries.

4. Plaintiff seeks compensatory damages, punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

5. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

6. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

7. This Court has supplemental jurisdiction over plaintiff's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

8. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

9. Pursuant to New York State General Municipal Law § 50-E, plaintiff filed a timely Notice of Claim with the New York City Comptroller. Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1-2) in that defendant CITY OF NEW YORK resides in this venue and plaintiff's claims arose within the confines of this judicial district.

**PARTIES**

11. Plaintiff LAUREN CALDERON, is a transgender Latina woman, and at all times relevant to this action was a resident of Queens County, New York.

12. Defendant, CITY OF NEW YORK, (hereinafter "CITY") is a municipal corporation, incorporated pursuant to the laws of the State of New York, which through its agency DOC, is authorized under the laws of the State of New York to maintain correctional facilities, which act as its agent and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of correctional facilities and the employment of correctional officers under its employ.

13. At all times relevant herein, Defendants DOC Commissioner JOSEPH PONTE, Supervising Warden VICTOR VASQUEZ, Warden TONY DURANTE, DOC Officers F/N/U GRIFFITHS, F/N/U DANIELS, and NYC DOC OFFICERS JOHN/JANE DOES Nos. 1-10 were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the CITY and/or DOC, and otherwise performed and engaged in conduct incidental to the performance of his lawful functions in the course of his respective duties. They were acting for and on behalf of the CITY and/or DOC at all times relevant herein, with the power and authority vested in them as officers, agents and

employees of the CITY and/or DOC and incidental to the lawful pursuit of their duties as officers, employees and agents of the CITY and/or DOC.

14. At all times relevant hereIN, Joseph Ponte was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of the City of New York, within the scope of his employment as such, and acting under color of state law. On information and belief, defendant Ponte, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct concerning all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, defendant Ponte is also responsible for the care, custody, and control of all inmates housed in the Department's jails. As Commissioner, Ponte was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails. In addition, at all relevant times, defendant Ponte was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the Unites States and of the State of New York.

15. Supervising Warden VICTOR VASQUEZ, was at all times relevant to this Complaint employed by the DOC and was responsible for the supervision of Corrections officers, Captains and other supervisors.

16. Warden TONY DURANTE, was at all times relevant to this Complaint employed by the DOC and was responsible for the supervision of Corrections officers, Captains and other supervisors.

17. The true names and shield numbers of defendants DOC Officers F/N/U GRIFFITHS, F/N/U

DANIELS, and NYC DOC OFFICERS JOHN/JANE DOES Nos. 1-10 are not currently known to plaintiff. However, all of said defendants are employees or agents of the DOC.

18. Defendants' acts herein complained of were carried out intentionally, recklessly, negligently, and with malice and gross disregard for plaintiff's rights.

## STATEMENT OF FACTS

### I.  History of Violence at Rikers Island

19. For decades, through Department reports and civil litigation, the DOC has been aware of the routine, dangerous and unconstitutional use of excessive force by staff at individual facilities under the control of the DOC.[1]

20. For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit ("CPSU"). That litigation unearthed evidence of abuse of prisoners and cover- ups that were sufficiently serious to merit criminal prosecution.

21. *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the pervasive practice of using excessive force against inmates incarcerated in New York City's jails. That litigation revealed significant numbers of credible excessive force complaints by prisoners who had been seriously injured by staff in the City jails. The settlement of that class action was intended to provide

---

[1] See, e.g., Fisher v. Koehler, 692 F. Supp. 1519 (S.D.N.Y. 1988) (Correctional Institution for Men), injunction entered, 718 F. Supp. 1111 (S.D.N.Y. 1989), aff'd, 902 F.2d 2 (2d Cir. 1990); Jackson v. Montemagno, No. 85 Civ. 2384 (E.D.N.Y.) (Brooklyn House of Detention); Reynolds v. Ward, No. 81 Civ. 101 (S.D.N.Y.) (Bellevue Prison Psychiatric Ward).

meaningful improvements in the training, practice, and supervision of DOC staff and investigators, and changes in the Department's use of force policy.

22. In 2011, the City was named as a defendant in *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), a class action lawsuit that alleges widespread use of excessive force by correction officers at Rikers Island. The operative complaint in that suit once again placed the City on notice that "officers and captains" at Rikers "have inflicted brutal beatings on . . . inmates" and "have lied and coerced false statements to prevent the beatings from coming to light," while supervisors have created and perpetuated "a policy of permitting uniformed staff to use unlawful, excessive force with impunity." Second Am. Compl., *Nunez v. City of N.Y.*, No. 11 Civ. 5845 (S.D.N.Y. Sept. 4, 2012), ECF No. 34 ¶ 1.

23. As a result of this lawsuit (in which the U.S. Attorney's Office intervened on behalf of the plaintiffs), the plaintiffs reached a settlement with the City on June 22, 2015, which included many reforms to the DOC's use-of-force practices such as the installation of additional cameras to monitor the interactions between guards and detainees.

24. This settlement was supposed to mark, once and for all, change to the practices of violence and unaccountability in City jails and at DOC.

25. However, these alleged ongoing reforms did not prevent the attack Ms. Calderon suffered. Nor has the Nunez consent decree prevented similar violations from occurring. On September 4th, 2015, the Bronx District Attorney's office charged two Correction Officers with assaulting an 18-year old-detainee in a storage room where there were no video surveillance cameras, and then filing false paperwork to conceal their actions. And on

November 30, 2017, a Captain and four Correction Officers were arrested on charges of beating an inmate so badly that several of his teeth were broken.

26. Indeed, the culture of violence on Rikers Island has proven so intractable that it has become necessary to shut down the entire complex.[2]

27. According to a report by a federal monitor, covering the period August 1, 2016 through December 31, 2016, guards continue to use brutal force at an alarming rate and continue to collude to cover-up the violence by falsifying documents. The report also found that the disciplinary system continues to be dysfunctional, with investigators favoring officers and failing to pursue discipline even when an officer's wrongdoing is clear.[3]

28. The United States Attorney's Office for the Southern District of New York has investigated the problem of excessive force by Department staff on Rikers Island, as have the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the Bronx District Attorney's Office, and the New York Times. Mark G. Peters, Commissioner of the Department of Investigation, condemned the "pattern of lawless conduct at Rikers that must be brought under control." The New York Times concluded, after a months-long investigation, that "brutal attacks by correction officers on inmates" are "common occurrences" at Rikers and observed that "a dearth of whistle-blowers" as well as "reluctance of the city's Department of Correction to acknowledge the problem and the fact

[2] Jonathan Lippmann & Melissa Mark-Viverito, Closing Rikers Island Is a Moral Imperative, N.Y. Times, Mar. 31, 2017.
[3] Michael Schwirtz, Brutal Force at Rikers Island Continues at an "Alarming Rate," Report Says, N.Y. Times, Apr. 3, 2017.

that guards are rarely punished" contribute to what the Times called a "culture of brutality on the island."[4]

29. Substantial evidence of these policies, practices, and/or customs has been widely known and reported for years. *See, e.g.*, Michael Schwirtz & Michael Winerip*, New York City Reviewing Rikers Assaults on 129 Inmates*, N.Y. Times, July 22, 2014 (reporting that Mark G. Peters, the Commissioner of the City's Department of Investigation, "emphasized that issues at Rikers appeared to go beyond mere brutality, and highlighted in particular efforts to cover up incidents"); Michael Winerip & Michael Schwirtz, Rikers: *Where Mental Illness Meets Brutality in Jail*, N.Y. Times, July 14, 2014 ("The Times uncovered details on scores of assaults through interviews with current and former inmates, correction officers and mental health clinicians at the jail, and by reviewing hundreds of pages of legal, investigative and jail records. Among the documents obtained by The Times was a secret internal study completed this year by the city's Department of Health and Mental Hygiene, which handles medical care at Rikers, on violence by officers. The report helps lay bare the culture of brutality on the island . . . . The study . . . found that over an 11-month period last year, 129 inmates suffered 'serious injuries' — ones beyond the capacity of doctors at the jail's clinics to treat — in altercations with correction department staff members. . . . The study also contained hints of efforts to cover up the assaults. . . . [N]one of the officers involved in the 129 cases have been prosecuted at this point, according to information from the Bronx

---

[4] Michael Winerip & Michael Schwirtz, Rikers: Where Mental Illness Meets Brutality in Jail, N.Y. Times, July 14, 2014.

district attorney's office. None have been brought up on formal administrative charges in connection to the cases so far either . . . ."); id. (reporting that DOC Commissioner Joseph Ponte "said policies governing when correction officers can use force were outdated" and "[r]ookie officers, who have almost no on-the-job training after the academy, often did not know when to use force and how to de-escalate confrontations rather than use violence."); Michael Schwirtz, *3 Rikers Officials Charged in Brutal Beating of Inmate*, N.Y. Times, July 10, 2014 (describing assault and cover up by DOC officers: "The beating was part of a pattern of brutality, neglect and corruption among correction officers and supervisors that officials say is rampant at Rikers Island."); Graham Rayman, *Rikers Scandal: Five Correction Officers Charged With Falsifying Reports*, Village Voice, June 15, 2012; Graham Rayman, *Rikers Violence: Out of Control*, Village Voice, May 9, 2012; Letters: *The View from Inside Rikers*, Village Voice, Feb. 11, 2009.

30. On August 4, 2014, the United States Attorney's Office for the Southern District of New York sent a 79-page letter to Mayor Bill de Blasio, Department of Correction Commissioner Joseph Ponte, and Corporation Counsel Zachary Carter that detailed the Department of Justice's investigation into the excessive use of force against adolescent inmates at Rikers Island from 2011 to 2013 ("DOJ Report"). Among other findings, the letter described the "systemic deficiencies that contribute to, exacerbate, and indeed are largely responsible for the excessive and unnecessary use of force by DOC staff."

31. Additionally, through DOC's elaborate reporting system, the Supervisory Defendants were aware of the pattern of a large number of incidents involving the use of unnecessary and/or

excessive force by DOC staff members resulting in serious injuries to inmates but failed to take sufficient steps to curb these abuses.

32. As of the time Ms. Calderon was assaulted, the Supervisory Defendants were aware of the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it.

33. In fact, since 2002, senior supervisors and uniformed staff in the DOC have been sued repeatedly by inmates alleging staff beatings. Many of these cases, all resulting in favorable settlements for the plaintiffs, include remarkably similar allegations of misconduct. *See, e.g.,*

- *Reynolds v. City of New York*, No. 11 Civ. 621 (S.D.N.Y.) (alleging beat-up in George Motchan Detention Center ("GMDC") resulting in shoulder fracture and loss of consciousness; settled for $200,500);

- *Mull v. City of New York*, No. 08 Civ. 8854 (S.D.N.Y.) (alleging beat-up in AMKC resulting in diffuse axonal injury to brain, partial loss of eyesight, and partial loss of hearing, and requiring the victim to take seizure medications; settled for $550,000);

- *Belvett v. City of New York*, No. 09 Civ. 8090 (S.D.N.Y.) (alleging beat-ups at GMDC and Robert N. Davoren Center ("RNDC") resulting in facial fracture; settled for $350,000);

- *Youngblood v. Baldwin*, No. 08 Civ. 5982 (S.D.N.Y.) (alleging beat-up at GRVCresulting in skull laceration and broken nose; settled for $240,000);

- *Williams v. City of New York*, No. 07 Civ. 11055 (S.D.N.Y.) (alleging beat-up in Otis Bantum Correctional Center ("OBCC") resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

- *Williams v. City of New York*, No. 09 Civ. 5734 (S.D.N.Y.) (alleging beat-up in RNDC resulting in laceration to head; settled for $87,500);

- *Lee v. Perez*, No. 09 Civ. 3134 (S.D.N.Y.) (alleging beat-up at North Infirmary Command ("NIC") resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

- *Shuford v. City of New York*, No. 09 Civ. 945 (S.D.N.Y.) (alleging two beat-ups at RNDC resulting in facial fractures; settled for $375,000);

- *Diaz v. City of New York*, No. 08 Civ. 4391 (S.D.N.Y.) (alleging beat-ups involving two inmates, one at AMKC and one at OBCC; settled for $400,000 and $450,000, respectively);

- *Lugo v. City of New York*, No. 08 Civ. 2931 (S.D.N.Y.) (alleging beat-up at NIC resulting in orbital fracture; settled for $185,000);

- *Cuadrado v. City of New York*, No. 07 Civ. 1447 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung; settled for $175,000);

- *Scott v. City of New York*, No. 07 Civ. 3691 (S.D.N.Y.) (alleging beat-up at GMDC resulting in orbital fracture; settled for $175,000);

- *Pischeottola v. City of New York*, No. 06 Civ. 2505 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung requiring chest tube; settled for $150,000);

- *Rice v. N.Y.C. D.O.C.*, No. 03 Civ. 582 (S.D.N.Y.) (alleging beat-ups of two inmates at GRVC resulting in collapsed lung and contusion hematomas in one case, and in neck and spinal cord injuries causing permanent stutter in the other; settled for $255,000 and $590,000, respectively);

- *Joseph v. N.Y.C. D.O.C.*, No. 02 Civ. 9219 (S.D.N.Y.) (alleging beat-up at GRVC resulting in orbital fracture; settled for $375,000).

34. According to the DOJ Report, there was and is a "deep seated culture of violence" "pervasive" across the various facilities on Rikers Island and "DOC staff routinely utilize force not as a last resort but instead as a means of control" and to "punish disorderly or disrespectful behavior."

35. The DOJ Report found that DOC staff reported using only limited physical force, such as control holds to subdue the inmate or guide him to the floor, while the inmate's injuries suggested that a much greater level of force was used. DOJ concluded that such a pattern strongly suggests that DOC staff routinely submit false reports, including, for example, when an inmate's injuries indicate that blows to the head were used.

36. Cover-ups are also a part of DOC culture. For example, according to the New York Times, DOC's own investigators produced a report in 2012, which concluded that Department staff, including the Warden and Deputy Warden of the RNDC, had participated or been complicit in the intentional falsification of statistics in order to create the false appearance that violence in the jail was declining. The report originally stated that "no legitimate explanation exists for the dramatic and inaccurate decreases in the number of inmate fights," and recommended that RNDC's warden and deputy warden be demoted because they "abdicated responsibility" and "failed to supervise, manage, or oversee the facility's reporting of violence statistics." Instead of demoting them, however, then-DOC Commissioner Dora Schriro ordered that the report be sanitized of any mention of their wrongdoing. The United States Attorney's Office, which was in the midst of investigating violence at the jail, received only the doctored report. When the cover-up was unearthed, the United States Attorney stated that such a cavalier attitude toward the truth "does not instill confidence in us that the City will quickly meet its constitutional obligations."[5]

37. According to former DOC Senior Deputy Commissioner Charles Daniels, defendant Joseph Ponte ordered him to falsify statistics concerning violence in City jails.[6]

38. The DOJ Report details the culture of covering up instances of unnecessary and excessive use of force by falsifying reports or asking detainees to "hold it down"— whereby the guards

---

[5] Michael Winerip, Michael Schwirtz, & Benjamin Weiser, Report Found Distorted Data on Jail Fights at Rikers, N.Y. Times, Sept. 21, 2014.
[6] Sara Dorn, Ponte Forced Me Out After I Refused to Lie About Jail Violence: Ex-Corrections Official, N.Y. Post, Dec. 30, 2017.

ask detainees not to report incidents of force in exchange for preferential treatment. The report references a "powerful code of silence" among prison staff where guards carry the expectation that they will face little or no consequences for their unlawful conduct." This culture of cover-ups permeates the DOC.

39. The DOJ report also highlighted the role played by "grossly inadequate" investigations of use of force incidents in the permeation of violence and unaccountability in City jails. The report concluded that DOC's "failure to conduct thorough and comprehensive use of force investigations has resulted in a system where staff are frequently not held accountable for policy violations and expect that their version of events will be accepted at face value with little scrutiny." The report cited several contributing factors to DOC's overall investigative ineptitude, including general bias toward officers' version of events, ignoring of contradicting evidence, and failure to reconcile factual discrepancies and deficiencies.

40. Chief among these deficiencies were officer accounts which were "inconsistent with reported injuries to the inmate or the involved officers, accounts that fail to explain why officers did not or could not have used a lesser level of force, and suspiciously similar statements and language in descriptions of incidents."

41. The DOJ report also noted the inexplicable failure to utilize video evidence in use of force investigations. The report referenced a general inability of facility investigators to "identify and reconcile material discrepancies between statements from involved officers, staff witnesses, reported injuries, and video surveillance." When video did exist, however, the report noted a failure by investigators to describe the events of the video, instead defaulting

to a "summary statement that the video was received and consistent with officer's use of force reports."

42. The DOJ report also cited the egregious untimeliness of ID investigations as a major contributing factor to the inadequacy of DOC investigations into use of force incidents. Indeed, the report noted that, despite DOC policy to maintain an investigation-conclusion average of 8 months, 42 percent of ID investigations were open between 151 – 350 days and 11 percent were still open beyond that timeframe. The report concluded that this "undue delay diminishes the quality of the investigations because, as time passes, witness memories fade and evidence becomes less available."

43. Cover-ups within the DOC have led to criminal convictions of correction officers as recently as December of 2016. On December 15, 2016 correction officer Brian Coll was convicted of using excessive force, causing the death of a 52-year old sickly detainee, and obstruction of justice for his efforts to cover-up the assault. Coll conspired with other officers to falsely portray the detainee as the aggressor in use of force reports the officers created after the incident, claiming that the detainee had attacked Coll with a cane. When no cane was recovered from the scene of the crime, a captain instructed another officer to remove a cane from a supply area and hand it off to investigators as the cane used in the incident. In a news release announcing the conviction, the office of the United States Attorney for the Southern District of New York specifically noted how "the conspirators filed false use of force reports with DOC and lied repeatedly to DOC supervisors, investigators, and to the Bronx District Attorney's office."

44. This opaque system has fostered an environment where evidence is often manipulated or discarded. DOC's continued failure to preserve video footage of use of force incidents, despite being on notice of their duty to do so, is a direct byproduct of this environment. In *Taylor v. City of New York*, 293 F.R.D. 601 (S.D.N.Y Sept. 4, 2013), DOC failed to preserve three hours of key surveillance video footage relating to an assault on the plaintiff involving detainees and correction officers. The Court held that the DOC had a duty to preserve such evidence and that, as a result of their inability to do so, preclusion of officer testimony regarding the footage and an adverse inference instruction were warranted sanctions.

45. Preservation of video evidence of use of force incidents is critical to the success of both internal disciplinary proceedings against officers and subsequent civil rights litigation. Indeed, the DOJ noted in its report that the DOC "relies heavily on video recordings in those instances where correction officers are actually charged and disciplined for excessive or inappropriate force." Even the head of the DOC Investigation Division noted that "video evidence is critical in cases of excessive or inappropriate force because that is the evidence that is most clear cut."

46. Nevertheless, the DOJ report concluded that "critical videotapes frequently go missing" including over 35 percent of the approximately 200 video recordings capturing use of force incidents that the DOJ had requested for its investigation. The report described the degree to which such videos go missing as "alarming" given that DOC "has a specific policy requiring any video recording of a use of force or alleged use of force to be retained…for no less than

four years, as well as detailed procedures for documenting the chain of custody for any such recordings."

47. The report concluded that the "frequency with which video evidence disappears either indicates an unacceptably blatant disregard for the Department's policies regarding the safeguarding of video evidence, or even more disturbingly, possible tampering with important evidence."

48. The City and the Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in the City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

49. Through all these cases and Department reports, the DOC and the Supervisory Defendants have been made aware of the widespread practice by DOC staff members of using excessive and/or unnecessary force to injure, and not restrain, inmates. They have also been made aware of the failure of DOC's Investigation Division to adequately investigate allegations of misconduct and of the de facto refusal of the Department to bring effective disciplinary charges against its officers, to promote institutional reform, and to protect the safety of prisoners confined in DOC custody.

50. The DOC has not taken sufficient steps to curb the abuse that occurs on a daily basis in New York City jails. Rather, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

## II.  Facts Specific to Transgender Inmates

51. The anti-gay/trans animus and cover-up that occurred in this case are manifestation of a pattern and practice of misconduct of which New York City policymakers have had actual and constructive notice, and yet have not prevented.

52. The problem of anti-gay/trans animus experienced in prison settings is longstanding and well-known. Despite being prohibited by DOC policy, there exists a pattern and practice among DOC staff of using transphobic slurs and disparate treatment.

53. In acknowledgment of this anti-gay/trans animus, a DOC Chiefs Order dated August 19, 2011 (No. HQ-00937-0) prohibits physical or verbal abuse, taunts, and denial of services to an inmate based on sexual orientation, and orders staff to prevent others from engaging in such misconduct.

54. The DOC failed to train their staff, including the individual defendants, to comply with this directive, and have failed to discipline DOC employees who violate this policy.

55. A federal Bureau of Justice Statistics ("BJS") study undertaken pursuant to the Prison Rape Elimination Act, 42 U.S.C. § 15601, reported that gay inmates are particularly vulnerable to sexual abuse in prison settings, including by staff. *See* BJS, U.S Dep't of Justice, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09* (Aug. 2010), at 14.[7]

56. Federal regulations pursuant to PREA that took effect in 2012 specifically require municipal correctional facilities like Rikers Island and EMTC to train employees "[h]ow to

---

[7] A*vailable at* http://www.prearesourcecenter.org/sites/default/files/library/80-sexualvictimizationinprisonsandjailsreportedbyinmatesaugust2010.pdf

communicate effectively and professionally with inmates, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming inmates." 28 C.F.R. l 15.3l (a)(9).

57. Defendant DOC Commissioner Joseph Ponte has acknowledged that that "transgender inmates are 'absolutely' among the most at-risk in prisons."[8]

58. Since December of 2014, Rikers Island has had a unit specifically to house transgender inmates.

59. In spite of their awareness of the risks faced by transgender inmates, and the availability of a separate housing unit and/or protective custody, the DOC has repeatedly failed to protect transgender inmates by placing them in protective custody or housing.

60. In spite of their awareness of the risks faced by transgender inmates, DOC employees have consistently failed to protect transgender inmates from assault by other inmates.[9]

61. In *Stinson v. City of New York*, 18-cv-00027-LAK (SDNY), a transgender inmate requested protective housing, and her request was summarily denied. She was thereafter brutally beaten by inmates and corrections officers.

62. Similarly, in *Austin  v. City of New York,* 16-cv-01648-JGK (SDNY), a transgender inmate was sexually assaulted after her requests to be placed in the transgender housing unit were denied.

---

[8] Danielle Tcholakian, *Transgender Unit at Rikers Island May Close Under New Federal Jail Rules*, DNAinfo, November 18, 2016 *available at* http://www.dnainfo.com/new-york/20161118/civic-center/rikers-island-department-board-correction-close-transgender-unit/.
[9] Andy Humm, *Horrors Persist for Trans Inmates at Rikers*, Gay City News, Jan. 22, 2015.

63. In spite of federal requirements that mandate screenings for populations vulnerable to sexual violence and the opportunity for trans people to be housed in accordance with their gender identity, DOC employees routinely deny requests from transwomen to be placed in protective housing, or transfer them out of protective housing. Aviva Stahl, *New York City Jails Still Can't Keep Trans Prisoners Safe*, Village Voice, Dec. 21, 2017.

64. Although the DOC was well aware that transgender inmates face a high risk of assault and sexual violence in general population, they failed to take any steps to protect Ms. Calderon, with predictably horrifying results.

### III.   Facts Specific to Lauren Calderon

65. These claims arose on or about February 15 - February 18, 2016, at the Anna M. Kross Center on Rikers Island and continued thereafter as set forth below.

66. At the time and place referred to above, Ms. CALDERON was a detainee in the custody of the DOC.

67. On or about February 15, 2016, defendants placed Ms. Calderon in an all-male dormitory in the Anna M. Kross Detention Center, although Ms. Calderon is a transgender woman.

68. Defendants were or should have been aware of the heightened risk faced by Ms. Calderon as a transgender inmate.

69. As a direct result of defendants' actions, Ms. Calderon was the victim of several physical and sexual assaults by male inmates based upon her gender identity and expression during her detention.

70. On one occasion, several of the male inmates grabbed Ms. Calderon by her legs and punched her in the face.

71. On another occasion, one of the male inmates forced Ms. Calderon to perform oral sex on him.

72. Ms. Calderon repeatedly requested that defendants place her in protective custody.

73. Her requests were denied and fell upon deaf ears.

74. After at least three days and multiple requests, Ms. Calderon was finally transferred by an extraction team of approximately seven of the individual defendants.

75. Ms. Calderon was handcuffed with her hands behind her back during this transfer.

76. As the individual defendants were transferring Ms. Calderon, the individual defendants intentionally and/or negligently threw Ms. Calderon down a staircase head-first.

77. Ms. Calderon landed on her face, causing substantial pain and serious physical injury.

78. As a result of these incidents, Ms. Calderon sustained severe physical, psychological and emotional injuries, mental anguish, suffering, humiliation, and embarrassment, and was otherwise damaged and injured.

**FIRST CAUSE OF ACTION**
**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION**
**THROUGH 42 U.S.C. § 1983**

79. Plaintiffs incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

80. By reason of the foregoing paragraphs, and by assaulting, battering, and using unnecessary, excessive, and unconscionable force, or by their deliberate indifference to the serious risk

20

that others would do so, the individual Defendants deprived Ms. Calderon of rights,

remedies, privileges, and immunities guaranteed to every person, secured by the Fourth,

Eighth, and Fourteenth Amendments, through 42 U.S.C. § 1983, including, without

limitation, deprivation of the following constitutional rights:

    a. Freedom from unreasonable seizures of her person, including but not limited to the use of excessive force;

    b. Freedom from cruel and unusual punishment;

    c. The right to due process of law;

    d. The right of association and expression under the First Amendment; and

    e. The enjoyment of equal protection, privileges and immunities under the law.

81. As a direct and proximate result of the misconduct and abuse of authority detailed above, Ms.

Calderon has endured substantial physical and emotional injuries and was otherwise

damaged and injured.

### SECOND CAUSE OF ACTION
### *MONELL* CLAIM AGAINST DEFENDANT CITY OF NEW YORK THROUGH 42 U.S.C. § 1983

82. Ms. Calderon incorporates by reference the allegations set forth in all preceding paragraphs

as if fully set forth herein.

83. At all times material to this complaint, there was a pattern and practice of conduct by DOC

officials on Rikers Island that violated the constitutional rights of transgender inmates. There

was, and is, a "deep-seated culture of violence" which was "pervasive" across the various

facilities on Rikers Island, and "DOC staff routinely utilize[d] force not as a last resort, but

instead as a means to control the [ ] population and punish disorderly or disrespectful

behavior." *See* Report from United States Attorney Preet Bharara to New York City Mayor Bill de Blasio, et al., dated August 4, 2014 ("U.S. Attorney Report"), at 3.[10]

84. At all times material to this complaint, Defendant City failed to properly train, screen, supervise, or discipline employees including the individual Defendants, and failed to inform supervisors of their need to train, screen, supervise, or discipline DOC employees such as the individual Defendants regarding the limits on using force and interacting with LGBT people.

85. Defendant City of New York, through DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Ms. Calderon's incarceration, as well as to the obvious risk of a series of repeated sexual assaults caused by housing her in an all-male dorm and refusing to place her in protective custody.

86. This widespread tolerance of corrections officer abuse, and widespread indifference to the needs of LGBT inmates constituted a municipal policy.

87. The above-described *de facto* policies, practices, customs and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

88. At all times material to this complaint, defendant THE CITY OF NEW YORK failed to properly train, screen, supervise, or discipline employees including defendants GRIFFITHS and DANIELS and failed to inform supervisors (including defendants GRIFFITHS and DANIEL'S supervisors) of their need to train, screen, supervise or discipline DOC

---

[10] *Available at* http://www.justice.gov/usao/nys/pressreleases/August14/RikersReportPR/SDNY%20Rikers%20 Report.pdf. Ms. CALDERON hereby incorporates the U.S. Attorney Report by reference herein.

employees such as defendants GRIFFITHS AND DANIELS regarding the limits on uses of force.

89. Further, the "DOC's hiring process has failed to recruit sufficient talented [corrections officers] and has failed, in some instances, to weed out those who would abuse their position." *See* New York City Department of Investigation Report on the Recruiting and Hiring Process of New York City Correction Officers, January 2015 ("DOI Report"), at 2.[11]

90. The above-described policies, practices, customs, and usages, and the above-described failure to properly hire, train, screen, supervise, or discipline, were direct and proximate causes of the unconstitutional conduct alleged herein, causing injury and damage in violation of Ms. CALDERON'S constitutional rights under the Due Process Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983.

91. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

### THIRD CAUSE OF ACTION
### ASSAULT AND BATTERY
### UNDER THE LAWS OF THE STATE OF NEW YORK

92. Ms. CALDERON incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

93. By the actions described above, the individual defendants did inflict assault and battery upon Ms. CALDERON. The acts and conduct of the individual defendants were the direct and

---

[11] *Available at* http://www.nyc.gov/html/doi/downloads/pdf/2015/jan15/pr01rikers_aiu_011515.pdf. Ms. CALDERON hereby incorporates the DOI Report by reference herein.

proximate cause of injury and damage to Ms. CALDERON and violated her statutory and

common law rights as guaranteed by the laws and Constitution of the State of New York.

94. The conduct of the individual defendants alleged herein occurred while they were on duty

and in uniform, and/or in and during the course and scope of their duties and functions as a

DOC official, and/or while they were acting as an agent and employee of defendant CITY,

clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is

liable to Ms. CALDERON pursuant to the state common law doctrine of *respondeat*

*superior*.

95. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

96. Ms. CALDERON incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

97. As demonstrated by the facts alleged herein, defendant CITY negligently hired, screened,

retained, supervised, and trained the individual defendants. The acts and conduct of the

individual defendants were the direct and proximate cause of injury and damage to Ms.

CALDERON and violated her statutory and common law rights as guaranteed by the laws

and Constitution of the State of New York.

98. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE

99. Ms. CALDERON incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

100.   The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff. The acts and conduct of the defendants were the direct and proximate cause of the injury and damage to the plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

101.   As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

## SIXTH CAUSE OF ACTION
### VIOLATION OF ARTICLE I, § 11 OF THE NEW YORK CONSTITUTION

102.   Ms. CALDERON incorporates by reference and re-alleges all of the preceding paragraphs of this complaint as though fully set fo1th herein.

103.   Article I,§ 11 of the New York Constitution provides that, "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

104.   LGBT persons "compose a class that is subject to heightened scrutiny." *Windsor v. United States,* 699 F.3d 169, 185 (2d Cir. 2012).

105.   By reason of the foregoing paragraphs, by discriminating against Ms. Calderon, Defendants deprived her of rights, remedies, privileges, and immunities guaranteed to every person, including, but not limited to the right guaranteed by Article I, § 11 of the New York Constitution to the equal protection of the laws.

106. The Individual Defendants acted under pretense and color of state law and within the scope of their employment as DOC officers and employees.

107. Defendant City of New York, through DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern, practice, or custom by DOC staff of discriminating against LGBT people.

108. As a direct and proximate result of Defendants' conduct, policies, practices, customs, and usages, Ms. Calderon sustained the injuries and damages set forth above, including but not limited to the deprivation of her right to equal protection and equal dignity.

**SEVENTH CAUSE OF ACTION**
**DISCRIMINATION IN VIOLATION OF N.Y. CIVIL RIGHTS LAW§ 40-C**

109. Ms. CALDERON incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

110. Section 40-c of the New York Civil Rights Law provides that, "[n]o person shall, because of ... sexual orientation ...[OR] …gender…., be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state."

111. By the conduct and actions described above, Defendants denied and/or aided, abetted, incited, compelled, or coerced the denial to the plaintiff of her civil rights on the basis of her gender and/or sexual orientation.

112. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

## JURY DEMAND

113.   Ms. CALDERON demands a trial by jury in this action on each and every one of her

damage claims.

## PRAYERS FOR RELIEF

**WHEREFORE**, Ms. CALDERON demands judgment against the defendants jointly and

severally and prays for relief as follows:

a.   That she be compensated for violations of her constitutional rights, pain,
     suffering, mental anguish, and humiliation; and

b.   That she be awarded punitive damages against the individual defendants; and

c.   That she be compensated for attorney' fees and the costs and disbursements of
     this action; and

d.   For such other further and different relief as to the Court may seem just and
     proper.

Dated:        New York, New York
              May 18, 2018

Respectfully submitted,

Rebecca M. Heinegg
Sarah Kunstler
*Attorneys for the Plaintiff*
277 Broadway, Suite 1501
New York, New York 10007
t: 212-227-2303